18CA2456 Peo v Romero 11-10-2021 COLORADO COURT OF APPEALS Court of Appeals No. 18CA2456 Adams County District Court No. 17CR161 Honorable Mark D. Warner, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Arnulfo Romero JR, Defendant-Appellant. JUDGMENT AFFIRMED Division III Opinion by JUDGE GRAHAM* Lipinsky and Brown, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced November 10, 2021 Philip J. Weiser, Attorney General, Rebecca A. Adams, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Patrick J. Mulligan, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellant *Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2021.
1 ¶ 1 G.S. and A.R. accused defendant, Arnulfo Romero — G.S.’s stepfather and A.R.’s father — of sexually assaulting them over a period of years while they were minors and adults. ¶ 2 The prosecution charged Romero with one count of sexual assault on a child, one count of sexual assault on a child as a part of a pattern of abuse, two counts of sexual assault on a child by one in a position of trust as a part of a pattern of abuse, three counts of sexual assault on a child by one in a position of trust, two counts of sexual assault, and one count of aggravated incest. ¶ 3 After Romero’s first trial resulted in a mistrial, he was retried, and a jury found him guilty as charged. ¶ 4 The trial court sentenced Romero to an aggregate term of thirty-three years to life in the custody of the Department of Corrections. ¶ 5 On appeal, Romero contends that (1) the trial court erred by admitting voicemails that he left on A.R.’s phone and A.R.’s testimony that he told her he took a photo of her vagina while she was sleeping; (2) the trial court abused its discretion by allowing a forensic interviewer to vouch for the credibility of G.S. and A.R.; (3) the evidence admitted at trial was not sufficient to support his 
2 convictions; (4) the prosecution committed misconduct in its examination of A.R. and during its rebuttal closing argument; and (5) the cumulative effect of the alleged errors prejudiced him and requires reversal. Because we disagree with all of Romero’s contentions, we affirm the judgment of conviction. I. The Voicemails and A.R.’s Testimony ¶ 6 We first consider whether the trial court erred by admitting (1) voicemails that Romero left on A.R.’s phone and (2) A.R.’s testimony that Romero told her that he took a photo of her vagina while she was sleeping. We discern no reversible error. A. Standard of Review ¶ 7 When an evidentiary issue is preserved at trial, we review the trial court’s decision on that issue for an abuse of discretion. See People v. Jimenez, 217 P.3d 841, 846 (Colo. App. 2008). “A court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law.” People v. Grant, 2021 COA 53, ¶ 12 (citations omitted). ¶ 8 But we will not reverse a conviction based on a trial error, such as the erroneous admission of evidence, if that error is harmless. See Salcedo v. People, 999 P.2d 833, 841 (Colo. 2000). 
3 An error is harmless if we can say with fair assurance that in light of the entire record of the trial, the error did not substantially influence the verdict or impair the fairness of the trial. See People v. Gaffney, 769 P.2d 1081, 1088 (Colo. 1989). ¶ 9 When the issue is not preserved, we review for plain error. See Hagos v. People, 2012 CO 63, ¶ 14. An error is plain if it is obvious and substantial, and so undermines the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. See id. To show plain error, the defendant must establish that an error occurred, and that it was “so clear cut and so obvious” that a trial judge should have intervened sua sponte to avoid it without the benefit of an objection. People v. Conyac, 2014 COA 8M, ¶ 54. An error is obvious when it contravenes a clear statutory command, a well-settled legal principle, or Colorado case law. People v. Pollard, 2013 COA 31M, ¶ 40. B. Voicemails ¶ 10 Romero contends that the trial court abused its discretion by admitting the voicemails because (1) their probative value was substantially outweighed by the danger of unfair prejudice under 
4 CRE 403 and (2) they constituted inadmissible other acts evidence under CRE 404(b). We disagree. ¶ 11 Before trial, Romero filed a motion to exclude recordings of voicemails that he left on A.R.’s phone the evening after the last alleged sexual assault, when she failed to return home after going out with her boyfriend. He argued that the voicemails were “highly inflammatory” because they included “sexist terms as well as threats to kill or otherwise harm the complaining witness and her boyfriend.” He also noted that in his first trial, “The court properly made a finding that the probative value of the voicemails is substantially outweighed by the danger of unfair prejudice.” ¶ 12 The trial court denied Romero’s motion. In so doing, the court clarified its ruling in the first trial: “Based upon defense strategy and questioning of the witnesses in the first trial, the Court found that the evidence was relevant and that the probative value was not substantially outweighed by the danger of unfair prejudice.” The court indicated that, at the first trial, it considered whether, under Frasco v. People, 165 P.3d 701 (Colo. 2007), and DeBella v. People, 233 P.3d 664 (Colo. 2010), repeated or unfettered access to the 
5 voicemails could prejudice Romero, and limited the admission of the voicemails on that basis: Here, to clarify the record of the [prior] Court’s analysis, the Court concluded that despite the relevance of the [voicemails] in the first trial, the Court found that repeated jury access to the [voicemails] very well could result in the jury ascribing undue weight to the evidence and thus the potential for the probative value of that evidence being substantially outweighed by the danger of unfair prejudice. ¶ 13 The trial court then stated: Although the Court has denied the motion, the Court will order that the [voicemails] will not be mentioned in opening statement by the [prosecution]. Further, the Court will hear in camera argument prior to the admission of the [voicemails]. The Court, depending on the evidence introduced at trial, impeachment of credibility of witnesses, and other factors must make an independent evaluation under CRE 401 and 403 in the context of the upcoming trial. ¶ 14 At trial, the prosecution argued that Romero manipulated and exerted “power and control” over G.S. and A.R., through violence and threats, so that he could sexually assault them and prevent them from disclosing the sexual assaults. It argued that “Romero was a man who drove to possess his daughters, who exerted power and control over their lives by sexually assaulting them time after 
6 time. . . . These sexual assaults occurred because [Romero] was jealous, because he was possessive.” ¶ 15 A.R. testified that Romero sexually assaulted her “hundreds” of times, often forcing her to engage in intercourse, from the time she was ten years old until she was eighteen years old. She testified that the sexual assaults were violent and that in some cases, Romero choked her and caused visible injuries. She testified that during one sexual assault, Romero choked her so severely that she had a bloody eye, which remained red for many days following the assault. ¶ 16 She also testified that during the “father-daughter dance at [her] quinceanera,” Romero told her that “no matter what [she was] always going to be his little girl and no one can ever have [her]. That [she was] only his.” She testified that before one sexual assault, Romero told her that “no matter what, that [she was] always going to be there at the house with him.” ¶ 17 A.R. testified that she did not initially disclose the sexual assaults because she “was afraid because [Romero] threatened that he would hurt [her] and [her] family.” 
7 ¶ 18 A.R. then testified that on the morning of January 13, 2017, she texted Romero to ask him if she could go to the movies with her boyfriend that evening. She testified that after everyone had left the family home except for her, Romero returned to the home and told her that she could not go to the movies with her boyfriend because he knew “exactly what [her boyfriend] wants from [her].” She testified that Romero sexually assaulted her; he pinned her down on the bed, took off her clothes, and forced his penis into her vagina while covering her mouth and choking her. A.R. testified that this was the last time Romero sexually assaulted her. ¶ 19 A.R. testified that she left with her boyfriend for the movies that evening. But she testified that she and her boyfriend got in an argument, so she had her boyfriend drive her to her sister’s house because she “didn’t want to go home anymore because of the incident that happened in the morning.” ¶ 20 A.R. also testified that while she was with her boyfriend on the evening of January 13, 2017, her parents were calling her, she did not answer their phone calls, and Romero left voicemails on her phone. The prosecution presented A.R. with Exhibit 14, which A.R. agreed was a “fair and accurate depiction of voicemails that were 
8 left for [her] by [Romero].” The prosecution moved to admit Exhibit 14, defense counsel objected, and the trial court admitted the exhibit. ¶ 21 G.S. and A.R.’s mother also testified about the events of January 13, 2017. During her testimony, the prosecution presented her with Exhibit 12. The mother agreed that Exhibit 12 was “a text message conversation between [her] and [Romero] beginning on the morning of January 13th, 2017, and going into the following day.” ¶ 22 The trial court admitted Exhibit 12 into evidence without objection. In Exhibit 12, Romero refers to A.R. in a text message as a “dumb a[**]” and a “little b[****].” ¶ 23 During the testimony of a police detective who investigated the case, the prosecution moved to publish Exhibit 14 for the jury. But defense counsel renewed the previous objection. ¶ 24 The trial court found that the voicemails were relevant but ordered that the prosecution could only play them one time to prevent any undue prejudice to Romero: All right. I guess what I want to note is unless the recording is vastly edited from what I 
9 heard at the last trial, I will probably let them listen to it in here, but not in the jury room. I think my order articulated what my concerns are. It is relevant, but it is based upon all testimony in the case so far. It is relevant, but I think repeatedly listening to it may result in undue prejudice to [Romero]. So it is one and done. ¶ 25 Exhibit 14 was then played for the jury. It contains a series of voicemails with a total length of approximately one minute. In the voicemails, Romero calls A.R. a “b[****]” several times. He also threatens to “press[] charges” against her boyfriend, to “beat the f[***]” out of her boyfriend, and to “f[*** her] up.” Romero then tells A.R. to answer her phone and asks her, “This is what you [are] f[***]in’ choosin’?” and “You’re eighteen, where the f[***] are you gonna go?” 1. CRE 403 ¶ 26 In general, all relevant evidence is admissible. See CRE 402; see also People v. Brown, 2014 COA 155M-2, ¶ 22 (“The Colorado Rules of Evidence strongly favor the admission of relevant evidence.”). Evidence is “relevant” when it has “any tendency to make the existence of any fact that is of consequence to the 
10 determination of the action more probable or less probable than it would be without the evidence.” CRE 401. ¶ 27 But even relevant evidence may be excluded when its probative value is substantially outweighed by the danger of unfair prejudice. See CRE 403. Unfair prejudice “refers to the tendency of the proposed evidence to adversely affect the objecting party’s position by injecting considerations extraneous to the merits of the lawsuit, such as the jury’s bias, sympathy, anger or shock.” People v. Dist. Ct., 869 P.2d 1281, 1286 (Colo. 1994) (quoting People v. Goree, 349 N.W.2d 220, 225 (Mich. Ct. App. 1984)). ¶ 28 In reviewing whether a trial court abused its discretion in admitting evidence under CRE 403, we afford the evidence its maximum probative value and its minimum danger of unfair prejudice. See People v. Greenlee, 200 P.3d 363, 367 (Colo. 2009). ¶ 29 We conclude that the trial court did not abuse its discretion by admitting the voicemails under CRE 403. See Grant, ¶ 12; Jimenez, 217 P.3d at 846. ¶ 30 The probative value of the voicemails was high. See Greenlee, 200 P.3d at 367. The voicemails were probative of Romero’s volatile and controlling relationship with A.R., in which he used threats to 
11 isolate A.R. from her boyfriend. See CRE 401-402; Greenlee, 200 P.3d at 367. They were also probative of Romero’s potential motive to sexually assault A.R. on the morning of January 13 in that they showed (1) Romero’s desire to maintain possession of A.R. by keeping her away from her boyfriend and (2) his jealousy at A.R. “choosin’” her boyfriend. See CRE 401-402; Greenlee, 200 P.3d at 367. ¶ 31 But the danger of unfair prejudice from the voicemails was very low. See Greenlee, 200 P.3d at 367. The voicemails were a very small part of the prosecution’s case. They were only approximately one minute long in total, and they were played for the jury only once. ¶ 32 The voicemails also did not “inject[] considerations extraneous to the merits” of the case. See Dist. Ct., 869 P.2d at 1286. Although, in the voicemails, Romero refers to A.R. as a “b[****],” Romero referred to A.R. in the same way in Exhibit 12 — which Romero did not challenge either at trial or on appeal. Likewise, although, in the voicemails, Romero threatened to hurt A.R. and her boyfriend, A.R. had already testified, without objection, that Romero threatened to hurt her and her family. 
12 ¶ 33 Accordingly, the trial court did not abuse its discretion by finding that the probative value of the voicemails was not substantially outweighed by their danger of unfair prejudice. See CRE 403; Greenlee, 200 P.3d at 367; Grant, ¶ 12; Jimenez, 217 P.3d at 846. ¶ 34 But even if the voicemails were not admissible under CRE 403, their admission would be harmless. See Salcedo, 999 P.2d at 841. As noted above, the voicemails were very short and were largely cumulative of other properly admitted evidence that showed that Romero called A.R. a “b[****]” and threatened to hurt her and her family. See People v. Jaramillo, 183 P.3d 665, 669 (Colo. App. 2008) (concluding that error in admitting testimony was harmless when testimony was cumulative of other testimony not challenged on appeal). And, although Romero’s very brief statements in the voicemails were unfavorable, these statements were “vastly overshadowed” by the evidence of his numerous, violent sexual assaults on A.R. People v. Herron, 251 P.3d 1190, 1198 (Colo. App. 2010). Accordingly, we can say with fair assurance that the erroneous admission of the voicemails would not have substantially 
13 influenced the verdict or impaired the fairness of the trial. See Gaffney, 769 P.2d at 1088. 2. Other Act Evidence ¶ 35 Because Romero did not object to the voicemails at trial on the basis that they were inadmissible under CRE 404(b) as other act evidence, we review for plain error. See Hagos, ¶ 14; People v. Acosta, 2014 COA 82, ¶ 76 (“[A]n issue is unpreserved for review when, among other things, (1) no objection or request was made in the trial court; or (2) an objection or request was made in the trial court, but on grounds different from those raised on appeal.” (quoting People v. Ujaama, 2012 COA 36, ¶ 37)). ¶ 36 “Evidence of any other crime, wrong, or act is not admissible to prove a person’s character in order to show that on a particular occasion the person acted in conformity with the character.” CRE 404(b)(1). ¶ 37 But res gestae evidence is “not subject to the general rule that excludes evidence” of other crimes, wrongs, or acts. People v. Quintana, 882 P.2d 1366, 1373 (Colo. 1994); see People v. Czemerynski, 786 P.2d 1100, 1109 (Colo. 1990) (concluding that res gestae evidence need not meet the procedural requirements of 
14 CRE 404(b)); People v. Griffiths, 251 P.3d 462, 467 (Colo. App. 2010) (concluding that a trial court can admit res gestae evidence without giving the jury a limiting instruction). “Res gestae evidence is ‘matter incidental to the main fact and explanatory of it, including acts and words which are so closely connected therewith as to constitute a part of the transaction, and without knowledge of which the main fact might not be properly understood.’” People v. Rollins, 892 P.2d 866, 872-73 (Colo. 1995) (quoting Woertman v. People, 804 P.2d 188, 190 n.3 (Colo. 1991)). ¶ 38 Res gestae evidence is “linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.” Quintana, 882 P.2d at 1373 (quoting United States v. Williford, 764 F.2d 1493, 1499 (11th Cir. 1985)). It is “[e]vidence of criminal conduct that occurs contemporaneously with or is part and parcel of the crime charged.” Callis v. People, 692 P.2d 1045, 1051 n.9 (Colo. 1984); see Jaramillo, 183 P.3d at 667-68 (concluding that in a case in which the defendant was charged with assaulting his wife, the wife’s testimony that the defendant had been accusing her of infidelity and was extremely jealous, extremely 
15 possessive, “very angry,” and “very accusative” during their marriage was admissible as res gestae). ¶ 39 We acknowledge that the supreme court is currently considering whether the res gestae doctrine should be abolished in Colorado. See People v. Rojas, 2020 COA 61 (cert. granted Oct. 6, 2020). Nonetheless, unless and until the supreme court abolishes the doctrine, it remains good law in this state. See People v. Smith, 183 P.3d 726, 729 (Colo. App. 2008) (holding that the court of appeals is bound by supreme court precedent). ¶ 40 We conclude that the trial court did not err, plainly or otherwise, by admitting the voicemails because they were admissible as res gestae of the sexual assault on the morning of January 13. See Hagos, ¶ 14; Rollins, 892 P.2d at 872-73; Quintana, 882 P.2d at 1373; Callis, 692 P.2d at 1051 n.9. The voicemails were linked in time with the sexual assault on the morning of January 13 because Romero left them on A.R.’s phone on the evening of January 13. See Quintana, 882 P.2d at 1373. They were also linked in circumstances with this sexual assault because that morning, Romero told A.R. she could not see her boyfriend and, in the voicemails, Romero threatened A.R. after she 
16 went out with her boyfriend. See id. And the voicemails were “part and parcel” of the sexual assault on the morning of January 13 because, as discussed above, they explained Romero’s volatile, controlling, and threatening relationship with A.R. and his potential motive to sexually assault A.R. that morning. Callis, 692 P.2d at 1051 n.9; see Rollins, 892 P.2d at 872-73; Jaramillo, 183 P.3d at 667-68. ¶ 41 Romero’s reliance on People v. Yachik, 2020 COA 100, for the proposition that the voicemails were not res gestae of the sexual assaults against A.R. is misplaced. In Yachik, the prosecution charged the defendant with two counts of sexual assault on a child by one in a position of trust as part of a pattern of abuse against his daughter. See Yachik, ¶¶ 1, 3-4. The trial court admitted, as res gestae of the “family dynamics” and “background” of the charged crimes, evidence that the defendant physically abused his daughter “almost daily,” including making her eat hot sauce concoctions, kicking her, beating her, choking her, and spraying her eyes with pepper spray. Id. at ¶¶ 1, 14-16. A division of our court concluded that the trial court abused its discretion by admitting this evidence as res gestae because the physical abuse was not “inextricably 
17 intertwined” with the sexual assaults. Id. at ¶ 25 (quoting People v. Coney, 98 P.3d 930, 933 (Colo. App. 2004)). The court noted that the daughter did not mention the physical abuse when testifying about the sexual assaults, that she denied that she feared physical abuse if she disclosed the sexual assaults, that she did not mention the physical abuse when asked why she did not initially report the sexual assaults, and that “there [was] no evidence [the daughter] was physically abused in connection with the sexual assaults.” Id. at ¶¶ 26-29. ¶ 42 But, unlike in Yachik, here, the voicemails were intertwined with the sexual assault on the morning of January 13. There was evidence — primarily A.R.’s testimony — that Romero used violent sexual assaults and threats of violence as a means of controlling and isolating A.R. The voicemails illustrated his volatile, controlling, and threatening relationship with A.R. and, in turn, Romero’s potential motive to sexually assault A.R. on the morning of January 13. See Rollins, 892 P.2d at 872-73; Callis, 692 P.2d at 1051 n.9; Jaramillo, 183 P.3d at 667-68. ¶ 43 But even if the trial court’s admission of the voicemails was error, the error would not be plain. See Hagos, ¶ 14. As discussed 
18 above, the voicemails were very brief and were largely cumulative of other evidence in the case. See People v. Arzabala, 2012 COA 99, ¶ 80 (concluding that improperly admitted evidence does not amount to plain error when the evidence was cumulative). The voicemails were also vastly overshadowed by the evidence of Romero’s numerous, violent sexual assaults on A.R. See Herron, 251 P.3d at 1198. Accordingly, any error in admitting the voicemails would not have so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of Romero’s judgment of conviction. See Hagos, ¶ 14. C. A.R.’s Testimony ¶ 44 Romero contends that the trial court committed plain error by admitting A.R.’s testimony that he told her that he took a photo of her vagina while she was sleeping because this testimony was evidence of another uncharged crime — sexual exploitation of a child — and was therefore inadmissible under CRE 404(b). We are not persuaded. ¶ 45 Because Romero did not object to this testimony, we review for plain error. See Hagos, ¶ 14. 
19 ¶ 46 At trial, during A.R.’s testimony about the sexual assaults, the following colloquy took place between the prosecution and A.R.: [Prosecution]: . . . I want to ask you some questions about a conversation that you – if you had a conversation with [Romero] about taking photographs of you while these sex assaults would occur. Did you ever have a conversation with [Romero] about that? [A.R.]: Yes. Q: Tell me specifically what [Romero] said to you. A: Well, him and my mom were arguing about some pictures on his phone. And then after they finished arguing, he came downstairs to my room, and into my room, and he said he almost got caught with the pictures. I asked him what pictures. And he said he had took pictures of me when I was asleep of my vagina. Q: During that conversation did he say anything to you about telling your mom about the photos? A: He said not to say anything because she thought that it was photos of her. Q: You never actually saw the photos or anything on his phone that he was talking to you about, right? A: No. 
20 Defense counsel did not object to this testimony. ¶ 47 We conclude that the trial court did not err, plainly or otherwise, in admitting the challenged testimony of A.R. because it was res gestae of the charged sexual assaults against her. See id.; Rollins, 892 P.2d at 872-73; Quintana, 882 P.2d at 1373; Callis, 692 P.2d at 1051 n.9. The conversation about the sexually explicit picture was linked in time and circumstances with, and was part and parcel of, the charged sexual assaults against A.R. because it occurred in the time period during which Romero was regularly sexually assaulting A.R. and reflected the ongoing, sexually abusive relationship between Romero and A.R. See Rollins, 892 P.2d at 872-73; Quintana, 882 P.2d at 1373; Callis, 692 P.2d at 1051 n.9; Jaramillo, 183 P.3d at 667-68. ¶ 48 But even if the trial court’s admission of A.R.’s testimony about the photo was error, the error would not be plain. See Hagos, ¶ 14. There was no evidence that Romero actually took the photo, and no such photo was admitted at trial. The testimony was a small part of the prosecution’s case and was vastly overshadowed by the evidence of Romero’s numerous, violent sexual assaults on A.R. See Herron, 251 P.3d at 1198. Accordingly, any error in 
21 admitting the challenged testimony would not have so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of Romero’s judgment of conviction. See Hagos, ¶ 14. II. Vouching ¶ 49 We next consider whether the trial court erred by allowing a forensic interviewer — who had interviewed both A.R. and G.S. — to vouch for their credibility. We conclude it did not. ¶ 50 Because Romero did not object to the forensic interviewer’s testimony on the basis that it vouched for the credibility of G.S. and A.R., we review for plain error. See Hagos, ¶ 14. ¶ 51 A witness is prohibited from testifying that another person was telling the truth on a particular occasion. Venalonzo v. People, 2017 CO 9, ¶ 32 (citing People v. Wittrein, 221 P.3d 1076, 1081 (Colo. 2009)); see also CRE 608(a). “The danger in admitting such testimony lies in the possibility that it will improperly invade the province of the fact-finder.” Venalonzo, ¶ 32. But a witness may give his or her personal opinion on another person’s demeanor, state of mind, or physical behavior “if it is based on a rational perception and personal observations.” See Acosta, ¶¶ 62-64; see People v. Farley, 712 P.2d 1116, 1119 (Colo. App. 1985) (“A lay 
22 witness may testify in the form of opinions or inferences so long as the opinion or inference expressed is rationally based on his perceptions and is helpful to the jury in understanding the testimony or in determining a fact in issue.” (citing CRE 701)), aff’d, 746 P.2d 956 (Colo. 1987). ¶ 52 At trial, the prosecution called a forensic interviewer to testify. The forensic interviewer was qualified as an expert in forensic interviewing. ¶ 53 The forensic interviewer testified that she interviewed both G.S. and A.R. The prosecution asked the forensic interviewer to describe their demeanor during the interviews: [Prosecution]: What was [G.S.’s] demeanor like as she went through the forensic interview with you? [Forensic Interviewer]: I would say she was emotional. She was very forthright and quite talkative. But tearful at times. And just kind of more of a free-flowing kind of information to questions. She seemed like she was really ready to kind of get it all out. Q: I want to ask you some questions about your interview with [A.R.]. Did you use the phased approach you described for the jury already? A: Yes, I did. 
23 Q: And the open-ended questions that you described during the course of your interview? A: That is correct. Q: What was [A.R.’s] demeanor like during the course of the interview? A: [A.R.] was -- I would say she appeared somewhat hesitant or concerned, somewhat closed off. ¶ 54 Defense counsel objected, arguing that the forensic interviewer was speculating. The trial court overruled the objection, finding that the testimony was based upon the forensic interviewer’s perception. ¶ 55 The forensic interviewer then testified that it took A.R. longer to feel comfortable during the interview: She was uncomfortable to say things. I think it took her longer. Well, I know it took her longer to feel comfortable in the room. I am not sure she was 100 percent comfortable at any time. But she did become more communicative. And she was certainly answering questions and fully cooperative. But it seemed like the words came harder. Defense counsel did not object to this testimony. ¶ 56 Video recordings of the forensic interviews of G.S. and A.R. were not admitted into evidence or played for the jury. 
24 ¶ 57 We conclude that the trial court did not err, plainly or otherwise, by allowing the challenged testimony by the forensic interviewer. See Hagos, ¶ 14. The forensic interviewer did not comment, either directly or indirectly, on the credibility of G.S. or A.R. See Venalonzo, ¶ 32. Instead, the forensic interviewer’s testimony — including her testimony that G.S. was “emotional,” “tearful,” and “seemed like she was really ready to kind of get it all out” and that A.R. was “hesitant” at first but was “fully cooperative” — was limited to a description, based on her personal observations, of G.S.’s and A.R.’s demeanors during the interviews. See Acosta, ¶¶ 62-64; see also Farley, 712 P.2d at 1119 (concluding that a counselor’s testimony describing the victim’s demeanor was proper where it was based on the counselor’s observations and did not include an opinion that the counselor believed the victim). ¶ 58 Although the forensic interviewer testified that G.S. was “very forthright” during the interview, the word “forthright” means “without hesitation” or “lacking ambiguity.” Webster’s Third New International Dictionary 895 (2002). It does not mean “truthful.” Accordingly, this was a description of G.S.’s demeanor and not a comment on her credibility. See Venalonzo, ¶ 32; Acosta, ¶¶ 62-64. 
25 ¶ 59 Yet, Romero contends that the forensic interviewer’s “testimony improperly suggested to the jury that the conclusion had already been reached that [he] had sexually assaulted [G.S.], and that [G.S.] simply had to ‘get it all out’ in the interview.” We disagree. The forensic interviewer did not state or imply that Romero had sexually assaulted G.S. And, although the forensic interviewer stated that G.S. seemed “like she was really ready to kind of get it all out” during the interview, she did not state that “it” was the truth or in any other way imply that G.S. was truthful during the interview. See Farley, 712 P.2d at 1119. ¶ 60 Romero’s reliance on Venalonzo for the proposition that the forensic interviewer in his case vouched for the credibility of G.S. and A.R. is misplaced. In Venalonzo — a child sexual assault case — our supreme court concluded that a forensic interviewer improperly vouched for the credibility of the child victims when she testified “that many of the children’s behaviors were common to other child sex assault victims she had interviewed and testified that some forensic interviews have led the People to drop charges against suspects.” Venalonzo, ¶ 35. It also concluded that the 
26 mother of one of the child victims improperly vouched for the child victim’s credibility when she testified that [the child victim] did not display any signs that she was lying when she reported the incident, that [the child victim] was not sophisticated enough to make up a story about the sexual assault, and that [the child victim] had no reason to accuse [the defendant] unless the incident had actually occurred. Id. at ¶¶ 39-40. ¶ 61 But, unlike in Venalonzo, the forensic interviewer in Romero’s case did not compare G.S.’s and A.R.’s demeanors to those of other sexual assault victims, compare the circumstances of this case to other cases of sexual assault, or suggest that G.S.’s and A.R.’s demeanors indicated that they were telling the truth. Instead, the forensic interviewer simply described G.S.’s and A.R.’s demeanors during the interviews based on her personal observations. See Farley, 712 P.2d at 1119; Acosta, ¶¶ 62-64. ¶ 62 Romero’s reliance on People v. Snook, 745 P.2d 647 (Colo. 1987), Tevlin v. People, 715 P.2d 338 (Colo. 1986), People v. Cernazanu, 2015 COA 122, People v. Bridges, 2014 COA 65, and People v. Koon, 724 P.2d 1367 (Colo. App. 1986), for the proposition 
27 that the forensic interviewer vouched for the credibility of G.S. and A.R. is also misplaced. • In Snook, the supreme court concluded that a social worker improperly vouched for the credibility of a child victim by testifying that “children tend not to fabricate stories of sexual abuse.” 745 P.2d at 648. • In Tevlin, the supreme court concluded that a social worker improperly vouched for the child victim by testifying that “he believed the [child] victim was telling the truth” when the child victim testified that the defendant “hit him with a belt and belt buckle.” 715 P.2d at 339-40. • In Cernazanu, a division of our court concluded that a parent improperly vouched for the child victim by testifying that the child victim did not display her “typical ‘lying’ behavior” when reporting the sexual assault. Cernazanu, ¶¶ 14-16. • In Bridges, a division concluded that a forensic interviewer improperly vouched for the credibility of the child victims by testifying that they “had not been coached.” Bridges, ¶¶ 12-
16. 
28 • In Koon, a division concluded that a therapist vouched for the credibility of the child victim by testifying that the child victim had “been really truthful” with her. 724 P.2d at 1370-71. ¶ 63 But, unlike in these cases, the forensic interviewer in Romero’s case did not testify that G.S. and A.R. had been truthful on any particular occasion, that their demeanors during the interviews indicated that they were not lying, or that sexual assault victims tend not to fabricate stories of sexual assault. Again, the forensic interviewer simply described G.S.’s and A.R.’s demeanors during the interviews based on her personal observations. See Farley, 712 P.2d at 1119; Acosta, ¶¶ 62-64. III. Sufficiency of the Evidence ¶ 64 We also consider whether the evidence presented at trial was sufficient to support Romero’s convictions. We conclude that the evidence was sufficient. ¶ 65 We review a challenge to the sufficiency of the evidence de novo to determine whether the evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, was substantial and sufficient to support a conclusion by a reasonable mind that the defendant is 
29 guilty of the offense beyond a reasonable doubt. See Clark v. People, 232 P.3d 1287, 1291 (Colo. 2010). ¶ 66 The “determination of the credibility of the witnesses is solely within the province of the fact finder.” People v. McIntier, 134 P.3d 467, 471 (Colo. App. 2005). “[I]t is the fact finder’s function in a criminal case to consider and determine what weight should be given to all parts of the evidence and to resolve conflicts, testimonial inconsistencies, and disputes in the evidence.” Id. ¶ 67 In our review on appeal, we “do not sit as a thirteenth juror to determine the weight of the evidence presented to the jury.” Clark, 232 P.3d at 1293. ¶ 68 At trial, G.S. testified that Romero forced her to engage in sexual intercourse on three separate occasions when she was between fifteen and sixteen years old. She also testified that Romero choked her during one sexual assault. ¶ 69 As noted above, A.R. testified that Romero sexually assaulted her on numerous occasions, forcing her to engage in sexual intercourse from the time she was ten years old until she was eighteen years old. 
30 ¶ 70 On appeal, Romero does not contend that the trial testimony of G.S. and A.R. — if found to be credible — was not sufficient evidence to support his convictions. Instead, Romero contends that G.S. and A.R. were not credible witnesses because they both “testified under oath in prior proceedings that they had never been assaulted by” Romero, there were “[m]ultiple significant inconsistencies between the various accounts given” by G.S. and A.R., and no “physical evidence of any kind was presented to corroborate or substantiate [their] allegations.” ¶ 71 In support of his contention, Romero points to the following: • G.S. admitted that she had previously testified under oath, in a custody hearing, that Romero had never sexually assaulted her or physically assaulted her. • G.S. also testified that, while Romero had assaulted her when she was sixteen years old, she did not tell her mother about the alleged assaults until 2017 (when she was twenty-four years old). • G.S. testified that A.R. initially said “no” when she was asked if Romero had any sexual contact with her. 
31 • G.S.’s father-in-law testified that although he was a law enforcement officer and a “mandatory reporter” of sexual assault allegations, he did not tell anyone about G.S.’s allegations until four years after G.S. first made the allegations. • A.R. testified that she first learned in June 2016 that G.S. had accused Romero of sexual assault and that when she was asked at that time whether Romero had ever sexually assaulted her, she said, “No.” • Although A.R. testified that Romero’s assaults were violent, sometimes causing visible injuries, there were no photographs of any of these injuries. • A.R.’s mother testified that she considered A.R. to be a “lying kid” and that A.R. initially denied that Romero had touched her improperly. • The trial court took judicial notice of A.R.’s testimony in Case No. 16DR30333, in which A.R. testified under oath she had never been beaten or assaulted by her mother or Romero. • The prosecution presented no medical or physical evidence to corroborate G.S.’s or A.R.’s allegations of sexual assault. 
32 ¶ 72 We conclude that the trial testimony of G.S. and A.R. was sufficient to support Romero’s convictions. See Clark, 232 P.3d at 1291. While their testimony may have been inconsistent and may not have been corroborated by physical evidence, it was the sole province of the jury to determine the weight and credibility of their testimony and to resolve any conflicts or inconsistencies in their testimony. See McIntier, 134 P.3d at 471. We will not sit as a thirteenth juror to determine the weight of their testimony for the jury. See Clark, 232 P.3d at 1293. IV. Prosecutorial Misconduct ¶ 73 We next consider whether the prosecution committed misconduct in its examination of A.R. and during its rebuttal closing arguments. A. Standard of Review ¶ 74 We engage in a “two-step analysis” when we review a claim of prosecutorial misconduct. Wend v. People, 235 P.3d 1089, 1096 (Colo. 2010). First, we must determine whether the prosecution’s “conduct was improper based on the totality of the circumstances and, second, whether such actions warrant reversal according to the proper standard of review.” Id. 
33 B. Examination of A.R. ¶ 75 Romero contends that the prosecution committed misconduct in its examination of A.R. when it elicited her testimony that Romero told her that he had taken a photo of her vagina while she was sleeping. We disagree. ¶ 76 Because Romero did not object on this basis at trial, we review for plain error. See Hagos, ¶ 14. ¶ 77 During its examination of A.R., the prosecution asked her if she had “a conversation with [Romero] about taking photographs of you while these sex assaults would occur.” A.R. responded by describing a conversation in which Romero “said he had took pictures of [her] when [she] was asleep of [her] vagina.” ¶ 78 The trial court admitted this testimony without objection, and we have concluded that the trial court did not err in admitting the testimony because it was res gestae evidence. ¶ 79 Under these circumstances, we conclude that the prosecution’s conduct in eliciting admissible testimony was not improper. See Wend, 235 P.3d at 1096. 
34 C. Rebuttal Closing Arguments ¶ 80 Romero contends that the prosecution committed misconduct in its rebuttal closing arguments by (1) misstating the evidence presented at trial; (2) denigrating Romero and defense counsel; and (3) referring to G.S. and A.R. as “girls.” We discern no reversible error. ¶ 81 The prosecution has wide latitude during closing argument and may “comment on the evidence admitted at trial, the reasonable inferences that can be drawn from the evidence, and the instructions given to the jury.” People v. Welsh, 176 P.3d 781, 788 (Colo. App. 2007); see People v. Allee, 77 P.3d 831, 837 (Colo. App. 2003) (“In closing argument, [a prosecutor] may employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance . . . .”). But the prosecution may not misstate the evidence, use arguments calculated to inflame the passions or prejudices of the jury, make statements reflecting a personal opinion or personal knowledge, or denigrate defense counsel. See People v. Gladney, 250 P.3d 762, 769 (Colo. App. 2010); People v. Walters, 148 P.3d 331, 334 (Colo. App. 2006); see also Domingo-Gomez v. People, 125 P.3d 1043, 1048 (Colo. 2005) (A “prosecutor, while free to strike 
35 hard blows, is not at liberty to strike foul ones.” (quoting Wilson v. People, 743 P.2d 415, 418 (Colo. 1987))). ¶ 82 We review a trial court’s ruling on the propriety of prosecutorial arguments for an abuse of discretion. See People v. Collins, 250 P.3d 668, 678 (Colo. App. 2010). ¶ 83 In reviewing whether a specific prosecutorial argument was improper, we evaluate the specific argument in the context of the closing argument as a whole and in light of the evidence before the jury. See Conyac, ¶ 132. We consider the language used by the prosecution, the context of the prosecution’s statements, the strength of the evidence, and whether the prosecution repeated the misconduct. See People v. Lovato, 2014 COA 113, ¶ 64. ¶ 84 And, in reviewing whether the prosecution’s rebuttal closing argument was improper, we consider defense counsel’s “opening salvo.” People v. Vialpando, 804 P.2d 219, 225 (Colo. App. 1990). We afford the prosecution considerable leeway in responding to defense counsel’s closing argument. Id. 1. Misstating the Evidence ¶ 85 Romero contends that the prosecution committed misconduct in its rebuttal closing argument when it misstated the evidence of 
36 what Romero told A.R. during the sexual assault on the morning of January 13, 2017. We conclude that the misstatement does not require reversal. ¶ 86 At trial, there was no evidence as to what Romero said to A.R. while he sexually assaulted her on the morning of January 13, 2017. ¶ 87 In its rebuttal closing argument, however, the prosecution stated: On the 13th of January 2017, [A.R.] was going to meet her new boyfriend. He had not been around for a long time. And . . . Romero could not handle it. He could not accept the fact that she was with someone else. As he is sexually assaulting her, he is asking her are you doing this with your boyfriend. ¶ 88 Defense counsel then objected, arguing: “That is not in evidence.” ¶ 89 The trial court responded to defense counsel’s objection: “The Court will simply instruct the jury they are to rely upon their individual and collective memories as to what the testimony is. Closing arguments are not evidence.” ¶ 90 After closing arguments, the trial court gave the jury written instructions, including the following: “During the trial, you received 
37 all of the evidence that you may properly consider in deciding the case. Your decision must be made by applying the rules of law that I give you to the evidence presented at trial.” ¶ 91 We conclude that the prosecution’s misstatement of the evidence of what Romero said to A.R. during the last sexual assault was harmless. See Salcedo, 999 P.2d at 841. This misstatement was an isolated comment in an otherwise proper closing argument in which the prosecution argued the evidence demonstrated that Romero committed the charged offenses. See People v. Ortega, 2015 COA 38, ¶ 55 (concluding that the prosecution’s comment appealing to the jury’s concerns for public safety was harmless because the comment “was an isolated incident in an otherwise proper closing argument” (quoting People v. Clemons, 89 P.3d 479, 483 (Colo. App. 2003))). And we presume the jurors followed the trial court’s instructions that they were “to rely upon their individual and collective memories as to what the testimony [was],” that “[c]losing arguments [were] not evidence,” and that they were to base their decision on the law and “the evidence presented at trial.” See People v. Rhea, 2014 COA 60, ¶ 68 (concluding that the prosecution’s misstatement of the evidence was harmless when the 
38 misstatement was isolated and the “trial court urged the jury to rely on its memory of the evidence”); People v. Lahr, 2013 COA 57, ¶ 25 (“Absent contrary evidence, we presume that jurors follow a district court’s instructions.”). Consequently, we can say with fair assurance that in light of the entire record of the trial, the misstatement did not substantially influence the verdict or impair the fairness of the trial. See Gaffney, 769 P.2d at 1088. 2. Denigrating Defense Counsel ¶ 92 Romero also contends that in its rebuttal closing argument, the prosecution “denigrated both [Romero] and defense counsel in claiming that the defense had ‘manufactured’ various inconsistencies in the testimony of the alleged victims.” We disagree. ¶ 93 In his closing argument, defense counsel argued, “We are here because of accusations that are inconsistent, that don’t make sense, that are not credible, because they are not true.” Defense counsel proceeded to discuss the inconsistencies in the victims’ testimony. 
39 ¶ 94 The prosecutor responded in rebuttal closing argument that the defense had “manufactured” various inconsistencies in the victims’ testimony: Now, from the beginning of this trial, and in defense’s closing argument, you heard a lot about all of the inconsistencies that you are going to hear in testimony. I want you to think back throughout all of the testimony that you heard. By and large those inconsistencies were manufactured for trial testimony. They did not exist. ¶ 95 Defense counsel objected, but the trial court overruled the objection, instructing the jury that “closing arguments are not evidence.” ¶ 96 The prosecution then specifically discussed one inconsistency highlighted by defense counsel: Think back to those cross-examinations. Think back to the cross-examination of [G.S.] The things that were highlighted, for example, after . . . Romero sexually assaulted her for the first time when she was 15-1/2 years old in the Northglenn home, she went to go clean herself up. And she was cross-examined extensively on whether that was with a tissue, or a piece of toilet paper, or a makeup wipe or rag. They are trying to use word choices to tell you that that is an inconsistency and that is not true. Because you can also look at the way that the girls were consistent. 
40 The prosecution then reviewed the ways in which the victims’ allegations were consistent. ¶ 97 We conclude that the trial court did not abuse its discretion by allowing the prosecution to argue that defense counsel “manufactured” inconsistencies in the testimony of G.S. and A.R. See Wend, 235 P.3d at 1096; Collins, 250 P.3d at 678; cf. People v. Alemayehu, 2021 COA 69, ¶ 100 (noting that a prosecutor commits misconduct when asserting in closing that the defendant “start[ed] manufacturing . . . lies” because a lawyer may not use any form of the word “lie” in characterizing a witness’s truthfulness for a jury). In context, the prosecution’s brief comment was not intended to denigrate defense counsel or Romero. See Conyac, ¶ 132; Lovato, ¶ 64. Instead, it was intended to counter defense counsel’s argument about the inconsistencies in the victims’ testimony and to focus the jury’s attention on the relevant evidence supporting the charged offenses. See Collins, 250 P.3d at 678 (concluding that the prosecution’s description of defense counsel’s theory of reasonable doubt as “absurd” did not denigrate defense counsel because it “was merely a response to defense counsel’s assertions that the jury could not find defendant guilty beyond a reasonable doubt”); People 
41 v. Perea, 126 P.3d 241, 248 (Colo. App. 2005) (concluding that the prosecution did not denigrate defense counsel with a comment that defense counsel “has misstated the law” because the comment was “made as a means of focusing the jury’s attention on relevant evidence”); Allee, 77 P.3d at 836 (concluding that it was not improper for the prosecution to ask the jury not to be confused by defense counsel’s tactics because the comment was intended to draw the jury’s focus to relevant evidence rather than to denigrate opposing counsel); Vialpando, 804 P.2d at 225. 3. “Girls” ¶ 98 Romero contends that the prosecution committed misconduct in its rebuttal closing argument when it made “an effort to engender sympathy” for A.R. and G.S. by referring to them as “girls.” We disagree. ¶ 99 G.S. and A.R. were minors when the charged offenses began and were twenty-five years old and nineteen years old at the time of trial. ¶ 100 As noted above, during its rebuttal closing argument, the prosecution stated, “[Y]ou can also look at the way that the girls 
42 were consistent.” Defense counsel then objected “to the use of the word girls.” The trial court overruled this objection. ¶ 101 We conclude that the trial court did not abuse its discretion by allowing the prosecution to refer to G.S. and A.R. as “girls.” See Wend, 235 P.3d at 1096; Collins, 250 P.3d at 678. In context, the prosecution did not use the word “girls” to engender sympathy for G.S. and A.R. See Conyac, ¶ 132; Lovato, ¶ 64. Instead, the prosecution used the word “girls” as a colloquial term for G.S. and A.R., who were minors when the charged offenses occurred and young women at the time of trial. See Webster’s Third New International Dictionary 959 (2002) (defining “girl” as “a female child,” “a young unmarried woman,” or “a single or married woman of any age”). V. Cumulative Error ¶ 102 Romero last contends that the cumulative effect of the errors in his case requires reversal. We disagree. ¶ 103 We must reverse a criminal conviction when “the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process.” Howard-Walker v. People, 2019 CO 69, ¶ 24 (quoting 
43 People v. Lucero, 200 Colo. 335, 344, 615 P.2d 660, 666 (1980)). We have rejected all of Romero’s contentions of error except for one instance of improper prosecutorial argument, which we concluded was harmless. Thus, there is no cumulative effect in Romero’s case. See id. VI. Conclusion ¶ 104 The judgment of conviction is affirmed. JUDGE LIPINSKY and JUDGE BROWN concur.